

**ORDERED in the Southern District of Florida on October 8, 2020.**

*Scott M. Grossman*
_____
**Scott M. Grossman, Judge**
**United States Bankruptcy Court**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:

BAL HARBOUR QUARZO, LLC,                    Case No. 18-11793-SMG
a/k/a Synergy Capital Group, LLC,
a/k/a Synergy Investments Group, LLC,

      Debtor.                                    Chapter 11
_____/

DREW M. DILLWORTH, as Trustee,

      Plaintiff,

v.                                          Adv. Pro. No. 20-01072-SMG

AMERANT BANK, N.A., f/k/a
MERCANTIL BANK, N.A., a
National Association,

      Defendant.
_____/

## ORDER DISMISSING AMENDED COMPLAINT WITH PREJUDICE

Perhaps frustrated by an onslaught of litigation that seemed to follow Bal Harbour Quarzo, LLC ("BHQ") and its principals at every turn, Amerant Bank, N.A., f/k/a Mercantil Bank, N.A. ("Amerant") clearly lost confidence in BHQ's ability to repay its debts. Indeed, Amerant may have even known (or at least suspected) that BHQ and its principals were defrauding other creditors. Amerant therefore exerted its leverage as a secured creditor to exit its relationship with BHQ and maximize recovery (or minimize losses) on its claims. According to Drew Dillworth, as Liquidating Trustee for BHQ (the "Trustee"), Amerant was "motivated by greed, and its urgent desire to exit its relationship"[1] with BHQ. But is that alleged motivation actionable? Or was Amerant acting within its legal and contractual rights in exerting its leverage as a secured creditor to maximize its recovery or minimize its losses?

According to the Trustee, Amerant is liable to repay certain transfers in connection with a distressed sale of BHQ's assets to a third party; for aiding and abetting BHQ's principals' breaches of their fiduciary duties; and for a conspiracy to breach the principals' fiduciary duties. The Trustee certainly tells a troubling tale of how BHQ's principals allegedly defrauded its non-bank investors, and went to great lengths to avoid paying their claims and judgments. Despite the concerning allegations, however, nothing in the Trustee's Amended Complaint plausibly alleges that any of the actual transfers to Amerant were made for any reason other than that BHQ had a legal obligation to make those payments. Nor does anything in the

---

[1] *Amended Adversary Complaint to Avoid and Recover Transfers and for Tort Damages* (ECF No. 5) (the "Amended Complaint") ¶ 3.

Amended Complaint plausibly suggest that Amerant aided and abetted, or conspired with, BHQ's principals to breach their fiduciary duties. The allegations show only that Amerant – even if it knew of its borrower's distress, insolvency, or even potential fraud – did nothing more than seek to minimize its losses, maximize its recovery, and extricate itself from a troubled lending relationship. That these actions may have resulted in many unsecured creditor investors recovering little on their claims is unfortunate; but it is not actionable against the bank.

## I.    Overview.

BHQ was a failed real estate development in South Florida. The Trustee sued Amerant to avoid and recover alleged fraudulent transfers, and for tort damages for alleged aiding and abetting breach of fiduciary duty and for an alleged conspiracy to commit breach of fiduciary duty. Count I of the Amended Complaint[2] alleges that certain payments made to (or for the alleged benefit of) Amerant in connection with BHQ's sale of its property to Beach Haus Bal Harbour, LLC ("Beach Haus") are avoidable as fraudulent transfers under Bankruptcy Code § 548(a)(1)(A) and recoverable under Bankruptcy Code § 550. Count II asserts substantially the same allegations, but under Florida Statute § 726.105(1)(a) and Bankruptcy Code § 544. Count III seeks damages for alleged aiding and abetting breach of fiduciary duty, and

---

[2] The Trustee filed his original *Adversary Complaint to Avoid and Recover Transfers and for Tort Damages* (ECF No. 1) on February 7, 2020. Exercising his right under Federal Rule of Civil Procedure 15(a)(1)(A), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7015, to amend his complaint once as a matter of course within 21 days after serving it, the Trustee filed his Amended Complaint on February 13, 2020.

Count IV seeks damages for alleged conspiracy to breach fiduciary duty. Each count also included a request for attorneys' fees and costs.

Amerant moved to dismiss[3] the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6)[4] for failure to state a claim upon which relief may be granted, asserting four principal arguments. First, Amerant argues the challenged transactions were not "transfers" by BHQ that can be avoided. Second, Amerant argues that the challenged transactions were not avoidable because Amerant held a fully secured claim and was not repaid more than it was owed,  BHQ's estate was not diminished by the payments to Amerant, and the Amended Complaint failed to allege any facts that would show an intent to defraud other creditors.[5] Third, Amerant argues the Trustee failed to plausibly allege aiding and abetting liability. And fourth, Amerant argues the Trustee failed to plausibly allege a conspiracy. Amerant also argues that there is no basis for the Trustee's request for attorneys' fees and costs.

In response,[6] the Trustee contends that the challenged transactions were transfers of property of the debtor subject to avoidance; that the transfer of a secured asset may be avoided; that the transferred property was not subject to a "valid" lien;[7]

---

[3] *Amerant Bank, N.A.'s Motion to Dismiss Adversary Complaint* (ECF No. 8) (the "Motion to Dismiss").

[4] Made applicable here by Federal Rule of Bankruptcy Procedure 7012.

[5] *Amerant Bank, N.A.'s Reply Memorandum in Support of Its Motion to Dismiss Adversary Complaint* (ECF No. 20) (the "Reply").

[6] *Liquidating Trustee's Response in Opposition to Amerant Bank, N.A.'s Motion to Dismiss Adversary Complaint [ECF No. 8]* (ECF No. 19) (the "Response").

[7] The Amended Complaint contains no plausible allegations supporting this argument. Nor does the Amended Complaint contain any claims for relief seeking to determine the validity, extent or priority of Amerant's lien. Accordingly, this argument lacks any merit, and is rejected without further discussion.

and that he pleaded sufficient facts to plausibly allege aiding and abetting and conspiracy claims. His Response also includes a "request" (but not a separate motion) to replead his Amended Complaint, in which he claimed that he "can plead additional factual detail regarding the Transfers, the Sale Transaction, and the Defendant's knowledge and wrongful involvement, but has endeavored to plead 'a short and plain statement' of the claim showing he is entitled to relief, in accordance with the Rules. *See* F.R.C.P. 8(a)(2)."[8] Upon consideration of the Amended Complaint, the Motion to Dismiss, the Response, and the Reply, and for the reasons discussed below, the Court will grant Amerant's Motion to Dismiss and dismiss the Trustee's Amended Complaint with prejudice.

## II.    A Complaint Must Plausibly State a Claim for Relief.

To avoid dismissal, a complaint must state a claim for relief that is "plausible on its face."[9] The plaintiff must plead sufficient facts – which the court must accept as true at this stage[10] – to allow the court "to draw the reasonable inference"[11] of a defendant's liability. But allegations containing only "'labels and conclusions' or 'a formalistic recitation of the elements of a cause of action,'"[12] and "conclusory allegations, unwarranted deductions of fact or legal conclusions masquerading as

---

[8] Resp. 19-20.

[9] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[10] *Iqbal*, 556 U.S. at 678.

[11] *Id.* (citing *Twombly*, 550 U.S. at 555-56).

[12] *Id.* (quoting *Twombly*, 550 U.S. at 555).

facts,"[13] will not suffice. If the "well-pleaded facts do not permit the court to infer more than the mere possibility" of liability, the complaint must be dismissed.[14]

Thus, in evaluating a motion to dismiss, the court must determine, based on "judicial experience and common sense," whether the well-pleaded facts in the complaint present a plausible claim for relief.[15] Allegations that give rise to an "obvious alternative explanation,"[16] however, will not meet the plausibility test.[17] Making the plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[18] Where the complaint's allegations fail to "nudge" the claims "across the line from conceivable to plausible," the court must dismiss the complaint.[19]

## III.    Facts.[20]

Juan Arcila and Carlos Mahecha[21] owned and controlled BHQ.[22] In late 2007, BHQ purchased real property consisting of twenty co-operative parcels (hotel units) in a small boutique hotel, a building that operated an apartment complex, and

---

[13] *Warren Tech., Inc. v. UL LLC*, 962 F.3d 1324, 1328 (11th Cir. 2020) (quoting *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004)).

[14] *Iqbal*, 556 U.S. at 679.

[15] *Id.*

[16] *Id.* at 682; *Twombly*, 550 U.S. at 567.

[17] *Twombly*, 550 U.S. at 557.

[18] *Iqbal*, 556 U.S. at 679.

[19] *Twombly*, 550 U.S. at 570.

[20] For purposes of considering the Motion to Dismiss, the Court accepts the ensuing facts alleged by the Trustee as true.

[21] The Trustee spells this individual's name as both "Maheca" and "Mahecha" alternatively throughout the Amended Complaint. For purposes of this Order, the Court will use the spelling "Mahecha."

[22] Compl. ¶¶ 14-16.

another vacant building (the "Property"),[23] for $22,422,000.[24] BHQ financed this purchase with a $15.5 million term loan from Amerant (the "Term Loan"), plus seller financing of $3 million,[25] and funded the balance with loans (the "Investor Loans") from individual investors (the "Investors"), most of whom were Colombian residents or entities owned or controlled by Colombian residents.[26] The Term Loan was secured by a mortgage in favor of Amerant.[27] BHQ later borrowed "millions of dollars" more from Amerant for construction on the Property (the "Construction Loan," and together with the Term Loan, the "Bank Loans").[28]

BHQ defaulted on many of the Investor Loans, and from 2010 through 2017, Investors filed approximately forty lawsuits against BHQ.[29] By 2015, certain of these Investors had obtained judgments against BHQ, and began collection proceedings.[30] Although BHQ was not able to pay these judgments,[31] it still continued to solicit new Investors[32] without disclosing these defaults, lawsuits, and related judgments and garnishments against BHQ.[33] Once BHQ received funds from new Investors, it would

---

[23] *Id.* ¶ 21.

[24] *Id.* ¶ 22.

[25] *Id.* ¶ 22.

[26] *Id.* ¶¶ 20, 22.

[27] *Id.* ¶ 22.

[28] *Id.* ¶ 23.

[29] *Id.* ¶ 25.

[30] *Id.* ¶ 26.

[31] *Id.* ¶ 26.

[32] *Id.* ¶ 27.

[33] *Id.* ¶ 27.

use a portion of those funds to make payments to earlier Investors (without disclosing this to the new Investors).[34]

In an alleged effort to hinder and delay Investors' collection efforts, BHQ sometimes moved money between and among bank accounts.[35] BHQ also undertook other actions to avoid paying its Investors, including implementing a sham sale of personal property to an affiliated entity[36] and filing false and misleading pleadings and affidavits in state court.[37] From at least July 2017, BHQ was insolvent and was unable to pay its debts as they came due, including the Bank Loans and the Investor Loans.[38]

BHQ was not Mr. Arcila and Mr. Mahecha's only real estate project, however. They also owned and controlled another entity, Luna Developments Group, LLC ("Luna").[39] In October 2012, Hemphill Financial, Ltd. ("Hemphill") obtained a $768,464.44 judgment against Luna, after Luna failed to repay a loan Hemphill made to it.[40] In post-judgment proceedings to collect on that judgment, Hemphill alleged that Mr. Arcila and Mr. Mahecha used Luna to run a "classic Ponzi/pyramid scheme" and that they were perpetrating a "massive fraud."[41] As part of its collection efforts,

---

[34] *Id.* ¶ 28.

[35] *Id.* ¶¶ 29, 33.

[36] *Id.* ¶ 30.

[37] *Id.* ¶¶ 31, 32.

[38] *Id.* ¶ 34.

[39] *Id.* ¶ 18.

[40] *Id.* ¶ 35.

[41] *Id.* ¶ 36.

Hemphill sued Amerant to avoid and recover an alleged $5 million transfer from Luna to Amerant, which Hemphill alleged was made with actual intent to hinder, delay or defraud Luna's creditors.[42]

By early 2017, BHQ was in "severe financial distress,"[43] and Mr. Arcila and Mr. Mahecha considered several options for BHQ, including engaging a commercial real estate firm to market and sell the Property[44] or filing a chapter 11 bankruptcy case for BHQ.[45] According to an appraisal obtained by Amerant, the Property was worth $40,260,000 as of January 25, 2017.[46] As financial pressures continued to mount, BHQ began discussions to sell the Property to Beach Haus.[47] On April 3, 2017, BHQ then entered into a series of agreements with Beach Haus, by which BHQ gave Beach Haus an option to purchase the Property for $20 million; BHQ and Beach Haus would endeavor to enter into a joint venture whereby BHQ would contribute the Property in exchange for a 45% interest in the joint venture and Beach Haus would invest $18 million in exchange for a 55% interest in the joint venture; and by which Beach Haus agreed to loan BHQ $1 million.[48]

---

[42] *Id.* ¶ 37.

[43] *Id.* ¶ 38.

[44] *Id.* ¶ 40.

[45] *Id.* ¶ 44.

[46] *Id.* ¶ 48. This was about $4.5 million less than its $44,820,000 appraised value in 2015. *Id.* ¶ 47.

[47] *Id.* ¶¶ 49-50.

[48] *Id.* ¶¶ 55-56. BHQ used the proceeds of the $1 million loan to satisfy one of the Investor's judgments and prevent an execution sale, to pay legal fees, and to transfer more than $300,000 to an affiliate. *Id.* ¶ 59.

But BHQ and Beach Haus did not consummate this contemplated joint venture, and instead BHQ ended up agreeing to sell the Property[49] to Beach Haus for $18 million "with adjustments," plus an "earn-out" in favor of BHQ (the "Earn Out").[50] The Earn Out "was neither an ownership interest nor an equity participation in Beach Haus and did not limit Beach Haus' complete control over the Property. Rather, the Earn-Out was Beach Haus' contractual obligation to make certain payments to BHQ in the future based on several contingencies, conditions and assumptions following a liquidity event."[51] The Earn Out was "deeply subordinated and contingent," and not secured by any collateral of Beach Haus.[52]

The sale to Beach Haus closed on July 13, 2017.[53] The Purchase and Sale Agreement and related closing statement required BHQ to fund $1,318,678.49 in closing and other seller-related costs.[54] Because BHQ did not have the cash to do so, Beach Haus funded these amounts, resulting in the ultimate purchase price for the Property – excluding the Earn Out – being $19,386,975.39.[55] Amerant received

---

[49] The Property consisted of substantially all of BHQ's assets, and included licenses, permits, authorizations, approvals and general intangibles, all appurtenant rights on the Property and all furniture, fixtures, equipment, machinery and other items of personal property located on or used in the operation of the Property. *Id.* ¶ 69.

[50] *Id.* ¶ 71.

[51] *Id.* ¶ 71.

[52] *Id.* ¶ 72.

[53] *Id.* ¶ 75. The Trustee also alleges that BHQ provided a false "Owner's Affidavit" to a title agent in connection with the closing, and that "upon information and belief" Amerant "knowingly allowed and facilitated . . . this communication to be delivered to the title agent." *Id.* ¶ 84. But the Trustee provides no factual support for this conclusory allegation.

[54] *Id.* ¶ 76.

[55] *Id.* ¶ 76.

$3,540,759.20 in cash from the closing, consisting of (1) $2,853,945.53 in payment of principal debt; (2) $483,403.33 in accrued interest; and (3) $203,410.34 as an impact fee.[56] Amerant was also credited $250,000 for a pre-closing deposit,[57] and received reimbursement of $100,000 in legal fees incurred in connection with Hemphill's collection litigation.[58] Besides the Earn Out, BHQ received no other proceeds from the sale,[59] and after the sale, BHQ was left with millions of dollars of claims and no meaningful assets – other than the Earn Out – with which to pay these debts.[60]

In addition to the payments it received from the closing, Amerant also financed a portion of Beach Haus's purchase[61] by extending a $9.265 million loan to Beach Haus.[62] In substance, Amerant allowed Beach Haus to assume $9,265,315.03 of BHQ's Term Loan.[63] But Amerant underwrote it as a new loan with Beach Haus as the borrower, and with the stated purpose being "to finance the acquisition" of the Property.[64] Amerant performed due diligence on Beach Haus and its insiders, required Beach Haus to execute a "new (amended and restated) note" from Beach Haus to Amerant, and required a new limited guaranty from a principal of Beach

---

[56] *Id.* ¶ 116.a.

[57] *Id.* ¶ 116.a n.6.

[58] *Id.* ¶ 116.b.

[59] *Id.* ¶ 85.

[60] *Id.* ¶ 85.

[61] *Id.* ¶¶ 77-79.

[62] *Id.* ¶ 78.

[63] *Id.* ¶¶ 77, 78. The Trustee and Amerant apparently dispute whether Beach Haus "assumed" the remainder of BHQ's debt to Amerant, or whether Amerant extended a new loan to Beach Haus to fund the purchase. This distinction makes no material difference to the Court's analysis.

[64] *Id.* ¶¶ 78, 79.

Haus.[65] As part of the transaction, Amerant then granted releases to BHQ, as well as to Mr. Arcila and Mr. Mahecha, as guarantors of the Bank Loans.[66] The releases, however, contained carve-outs for certain fraudulent transfer claims, including those that could be brought by BHQ or a bankruptcy trustee for BHQ.[67] Amerant also required BHQ to pay Hemphill $1,000,000 to satisfy its judgment against Luna.[68]

The Trustee alleges that Amerant understood BHQ's financial distress.[69] The Bank Term Loan was placed in Amerant's "special assets" division during 2009, where it remained until 2012,[70] and in 2013, Amerant "flagged" BHQ's account for a Bank Secrecy Act inquiry.[71] Amerant also learned in 2013 that BHQ had approximately $16 million in debt separate from the Bank Loans.[72] After two missed payments to Amerant in the summer of 2016, Amerant again transferred the Bank Loans to its "special assets" division, where they remained until the sale to Beach Haus closed in July 2017.[73] At or around this time, Amerant knew about the Investors' lawsuits against BHQ.[74] And of course as defendants in litigation brought by Hemphill seeking to avoid and recover from Amerant alleged fraudulent transfers

---

[65] *Id.* ¶ 78.

[66] *Id.* ¶ 78.

[67] *Id.* ¶ 106.

[68] *See* notes 39-42, *supra*.

[69] Compl. ¶ 86.

[70] *Id.* ¶ 87.

[71] *Id.* ¶ 88.

[72] *Id.* ¶ 89.

[73] *Id.* ¶ 90.

[74] *Id.* ¶ 91.

by Luna, Amerant was certainly aware that Hemphill had alleged that Mr. Arcila and Mr. Mahecha were operating a "Ponzi/pyramid scheme."[75]

With a distressed credit in its special assets division, Amerant understandably was closely monitoring the situation, and was in frequent communication with BHQ about, among other things, certain of the Investors' litigation and efforts to collect on their judgments.[76] Amerant was also concerned that other Investors might file fraudulent transfer claims seeking recovery against Amerant.[77] And Amerant expressed to BHQ Amerant's "very strong desire" for BHQ to avoid bankruptcy.[78] By the time the sale to Beach Haus closed on July 13, 2017,[79] the Bank Loans were in default[80] and Amerant's internal records showed its concern that BHQ "demonstrated an inability and/or unwillingness to make payment in a timely manner as evident by a slow payment history and previous garnishments on their [Amerant] deposit accounts."[81]

After the Beach Haus sale closed, BHQ (through Mr. Arcila) prepared and sent a letter to the Investors "regarding, among other things, the sale transaction," which letter was intended to "keep investors calm" and "prevent more lawsuits."[82] By the

---

[75] *Id.* ¶ 92.

[76] *Id.* ¶ 93.

[77] *Id.* ¶ 94.

[78] *Id.* ¶ 95.

[79] *Id.* ¶ 75.

[80] *Id.* ¶ 34.

[81] *Id.* ¶ 98.

[82] *Id.* ¶ 111.

time the letter was sent, though, a receiver had been appointed for BHQ (which fact was not disclosed in the letter).[83] The letter also failed to inform the Investors of lawsuits filed by certain other Investors, that BHQ had paid millions of other Investors' claims, and that BHQ considered and rejected a chapter 11 bankruptcy filing.[84] Mr. Arcila was ultimately indicted in December 2019 for one count of conspiracy to commit wire fraud.[85]

## IV.   Analysis.

### A.   <u>Fraudulent Transfer Claims</u>.

    *1.   Which of the Challenged Transactions Are Actually "Transfers" Subject to Avoidance?*

The Trustee seeks to avoid and recover the following alleged transfers to Amerant related to BHQ's sale of its Property to Beach Haus on July 13, 2017,[86] under Bankruptcy Code § 548(a)(1)(A) and Florida Statute § 726.105(1)(a) (made applicable here by Bankruptcy Code § 544(b)):[87]

- **$3,540,759.20**: consisting of (1) $2,853,945.53 in payment of principal debt to Amerant; (2) $483,403.33 in accrued interest; and (3) $203,410.34 as an impact fee (the "Secured Claim Paydown");[88]

---

[83] *Id*. ¶ 112.

[84] *Id*. ¶ 112.

[85] *Id*. ¶ 114.

[86] *Id*. ¶ 116.

[87] Bankruptcy Code § 544 allows a trustee to "avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable [state] law by a creditor holding an [allowable] unsecured claim." 11 U.S.C. § 544(b). The applicable state law here is Florida's Uniform Fraudulent Transfer Act, Fla. Stat. § 726.101, *et seq.* ("FUFTA").

[88] As part of the Secured Claim Paydown, Amerant was credited for a $250,000 pre-closing deposit. Compl. ¶ 116.a n.6.

- **$100,000.00**: for reimbursement of Amerant's legal fees incurred in the Hemphill Litigation (the "Legal Fee Reimbursement");

- **$9,265,315.03**: the amount of BHQ's debt that Beach Haus assumed as part of the sale transaction (the "Debt Assumption"); and

- **$1,000,000.00**: $1,000,000 paid by BHQ to Hemphill ("Hemphill Payment"), to satisfy Hemphill's judgment[89] against Luna,[90] but which [allegedly] benefitted Amerant by resolving the Hemphill fraudulent transfer litigation.[91]

The first step in determining whether the Amended Complaint states a claim is to determine whether the challenged transactions are "transfers" subject to avoidance.

The Bankruptcy Code[92] defines "transfer," in relevant part, as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an interest in property."[93] FUFTA similarly defines "transfer" as meaning "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance."[94] FUFTA then defines "asset" to mean "property of a debtor" but specifically excludes "[p]roperty to the extent it is encumbered by a valid lien."[95]

---

[89] Compl. ¶ 81.

[90] *Id.* ¶¶ 35-36.

[91] *Id.* ¶ 36.

[92] 11 U.S.C. § 101, *et seq.*

[93] 11 U.S.C. § 101(54)(D).

[94] Fla. Stat. § 726.102(14).

[95] Fla. Stat. § 726.102(2). FUFTA also provides that a transfer is not voidable under § 726.105(1)(b) or § 726.106 if the transfer results from "[e]nforcement of a security interest in compliance with Article 9 of the Uniform Commercial Code." Fla. Stat. § 726.109(5)(b).

As noted, under both the Bankruptcy Code and FUFTA, an "indirect" transfer may be a transfer that is subject to avoidance.[96] The Trustee alleges here that BHQ had no cash when it sold the Property to Beach Haus, and that Beach Haus therefore funded the cash required of BHQ at closing.[97] Thus, the Trustee's allegations suggest that the Secured Claim Paydown, the Legal Fee Reimbursement, and the Hemphill Payment were paid with cash originating from Beach Haus. Accepting the Amended Complaint's allegations as true for purposes of this Order, the Court will therefore assume that the Secured Claim Paydown, the Legal Fee Reimbursement, and the Hemphill Payment were indirect transfers of interests of BHQ in property. But unlike the Secured Claim Paydown and the Legal Fee Reimbursement, the Hemphill Payment was not a transfer to Amerant. This transfer was to Hemphill. Indeed, in another adversary proceeding related to BHQ's bankruptcy case, the Trustee has separately sued – and obtained a default judgment against – Hemphill avoiding this very transfer.[98] That Amerant insisted on BHQ satisfying Hemphill's claims does not

---

[96] *See In re FBN Food Serv., Inc.*, 175 B.R. 671, 683 (Bankr. N.D. Ill. 1994), *aff'd sub nom. In re FBN Food Servs., Inc.*, 185 B.R. 265 (N.D. Ill. 1995), *aff'd and remanded sub nom. Matter of FBN Food Servs., Inc.*, 82 F.3d 1387 (7th Cir. 1996) ("an indirect transfer is when A has a claim against B, and instead of B paying A directly for the claim, A directs B to pay C. The transfer from A to C is an indirect transfer of A's property.") (citing *Virginia Nat. Bank v. Woodson*, 329 F.2d 836 (4th Cir.1964); *Smith v. Patton*, 194 Ill. 638, 62 N.E. 794 (1902)).

[97] Compl. ¶ 76.

[98] *Dillworth v. Hemphill Fin., Ltd.*, Adv. No. 20-01075-SMG. The Court can always take judicial notice, under Fed. R. Ev. 201(c)(1), of its own docket when considering a Rule 12(b)(6) motion. *Harrington v. Racki (In re Bishop)*, 578 B.R. 158, 164 (Bankr. W.D.N.Y. 2017) ("The Court can always take judicial notice of its own docket"); *In re HRN Grp., LLC*, No. 18-63282-WLH, 2020 WL 426048, at *2 (Bankr. N.D. Ga. Jan. 27, 2020) (quoting *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999)) ("As the Eleventh Circuit has explained, '[i]n determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record . . . may be taken into account.'").

in any way suggest that the Hemphill Payment was a transfer to Amerant.[99] Accordingly, the Hemphill Payment was not a transfer to Amerant that is subject to avoidance here.

Likewise, the Debt Assumption (Beach Haus's assumption of BHQ's remaining debt, or Amerant's extension of new credit to Beach Haus in an equal amount, regardless of how characterized) was not a transfer of an interest of BHQ in property to Amerant. Under FUFTA, "property" is defined as anything that may be the subject of ownership."[100] The debt initially owed by BHQ to Amerant – and then assumed by Beach Haus – was not property of BHQ. It was a liability or obligation of BHQ, and was property of Amerant.[101] Thus, BHQ did not transfer any "property" it owned to Amerant in connection with the Debt Assumption. Before the "transfer," BHQ owed Amerant $9.265 million. After the "transfer," Beach Haus then owed Amerant $9.265 million, and BHQ was relieved of this liability. Even though the definition of a transfer is broad, and a transfer can be "indirect," no asset or property of BHQ was

---

[99] The Trustee suggests, however, that Amerant "received the benefit of $1,000,000 in liability reduction" by virtue of this payment. Compl. ¶ 117. Putting aside for a moment that receiving "the benefit of" a hypothetical liability reduction is not the same thing as receiving property or an interest in property from a debtor, this argument really is – to quote the Trustee – a classic "straw-man" argument. *See* Resp. 5, 12. The Trustee bases his argument on the *assumption* that Amerant was actually liable to Hemphill as the recipient of an alleged fraudulent transfer from Luna. But there are no allegations in the Amended Complaint to support this contention. An equally plausible explanation is that Hemphill – perhaps somewhat like the Trustee here – was pursuing a claim against a bank that received a payment from Hemphill's debtor (Luna), and sought to challenge that payment so that it could try to claw back those funds in order to recover on its own claim.

[100] Fla. Stat. § 726.102(11). The Bankruptcy Code does not define "property," but the definition of "transfer" in the Bankruptcy Code includes "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—(i) property; or (ii) an interest in property." 11 U.S.C. § 101(54).

[101] *Delaware v. New York*, 507 U.S. 490, 499 (1993) ("the property interest in any debt belongs to the creditor rather than the debtor").

transferred to Amerant as part of this transaction.[102] The asset of BHQ that was transferred in connection with this transaction was the Property. But the Property was transferred to Beach Haus,[103] not to Amerant. The Debt Assumption was therefore not a transfer that can be avoided as to Amerant under either the Bankruptcy Code or FUFTA.[104] Accordingly, the only transfers to Amerant potentially subject to avoidance are the Secured Claim Paydown and the Legal Fee Reimbursement. But, as discussed next, there are no plausible allegations that these transfers were made for any reason other than that BHQ was legally obligated to make them to Amerant.

> 2.    *The Trustee Has Not Plausibly Alleged Actual Intent to Hinder, Delay or Defraud Creditors.*

The Trustee characterizes the challenged transactions as "actual intent fraudulent transfer[s],"[105] but argues that he has not pleaded the term "defraud."[106] In other words, of the phrase "actual intent to hinder, delay or defraud creditors," the

---

[102] *See, e.g., In re Brasby*, 109 B.R. 113, 124 (Bankr. E.D. Pa. 1990), *aff'd sub nom. Brasby v. Joseph G. Perry, Inc.*, No. CIV. A. 90-0859, 1992 WL 21362 (E.D. Pa. Jan. 27, 1992) ("[a]ssumption of secured debt is generally viewed as a component of the purchase price" paid to a debtor. It is value given to a debtor, not taken away.")

[103] Indeed, in the related adversary proceeding of *Dillworth v. Beach Haus Bal Harbour, LLC*, Adv. Pro. No. 18-1448-SMG, the Trustee previously sued Beach Haus to avoid the transfer of the Property to Beach Haus. That adversary proceeding was later settled by Beach Haus for $7.5 million (Main Case ECF No. 505). As noted above, the Court may take judicial notice of its own docket in considering a Rule 12(b)(6) motion. *See* note 98, *supra.*

[104] Even if the Debt Assumption could be characterized as a payoff of BHQ's debt to Amerant (rather than an assumption by Beach Haus of this debt) – and therefore a transfer from BHQ to Amerant – for the reasons discussed below, there are no plausible allegations that this transfer was made for any reason other than that BHQ owed this money to Amerant in respect of its secured claim.

[105] Compl. ¶ 124.

[106] Resp. 10 n.28.

Trustee claims he is only seeking to avoid the alleged transfers as having been made with the actual intent to hinder or delay BHQ's creditors. In defending his Amended Complaint from dismissal, however, the Trustee then argues the he has specifically pleaded facts "supporting the Debtor's fraudulent intent to hinder and delay creditors."[107] Either way, the Trustee fails to plausibly allege these transfers were made with actual intent to hinder or delay BHQ's creditor's, or with fraudulent intent to hinder or delay BHQ's creditors.

In support of his claims, the Trustee alleges six statutory badges of fraud establish that BHQ "had the actual intent to hinder and/or delay its creditors in connection with the sale transaction" and in making the transfers at issue: (a) that the transfers were not disclosed or were concealed; (b) before the transfer was made the debtor had been sued or threatened with suit; (c) the debtor was insolvent or became insolvent shortly after the transfer was made; (d) the transfer occurred shortly before or shortly after a substantial debt was incurred; (e) the debtor retained possession or control of the property transferred after the transfer; and (f) the transfer was of substantially all of the debtor's assets.[108]

---

[107] Resp. 10. Without explaining this seemingly nuanced distinction, the Trustee appears to be arguing that he is *not* alleging any of the alleged transfers were made with actual intent to defraud BHQ's creditors, but instead that they were made with fraudulent intent to hinder and delay BHQ's creditors. The Trustee offers no cogent argument or supporting case law to support any meaningful distinction between "a transfer made with actual intent to hinder, delay or defraud creditors," and "a transfer made with fraudulent intent to hinder and delay creditors." Regardless, for the reasons discussed above, the Amended Complaint fails to state a claim under either phrasing of the language.

[108] Compl. ¶ 120.

But to prosecute a claim based on actual intent to hinder, delay, or defraud a creditor, the plaintiff must show that the alleged fraudulent intent is related to the transfers sought to be avoided.[109] Here, of the six badges of fraud alleged, only two even arguably apply to the transfers at issue to Amerant:[110] that before the transfers were made BHQ had been sued or threatened with suit, and that BHQ was insolvent or became insolvent shortly after the transfers. The other alleged badges are not plausibly applicable here. There are no plausible allegations that any of the subject transfers were not disclosed or were concealed. The sale of the Property to Beach Haus was a publicly recorded and documented transaction, as would have been Beach Haus's assumption of the mortgage debt. And that BHQ may have been concealing other assets and transfers from its other creditors is not probative of whether the transfers at issue to Amerant were made with actual intent to hinder delay or defraud creditors.

Likewise, there are no plausible allegations that any of the transfers occurred shortly before or shortly after a substantial debt had been incurred. The allegations show that BHQ had incurred substantial debt over many years. And while creditors were actively pursuing BHQ to obtain judgments at the time of the transfers here, that does not equate to incurring a new substantial debt shortly before or shortly

---

[109] *Bakst v. Bank Leumi, USA (In re D.I.T., Inc.)*, 561 B.R. 793, 803 (Bankr. S.D. Fla. 2016) (citing *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56-57 (2d Cir. 2005)).

[110] Indeed, it appears the Trustee is confusing badges of fraud that would pertain to his fraudulent transfer claim against Beach Haus with respect to the Property, with any potentially applicable badges of fraud as to the actual transfers at issue here from BHQ to Amerant.

after any of the specifically alleged transfers. The judgments being sought by the Investors were in respect of debts incurred well before these alleged transfers.

The allegation that BHQ retained possession or control of the property transferred through the Earn Out is not only not plausible, it directly contradicts the Trustee's earlier allegation that the Earn Out "was neither an ownership interest nor an equity participation in Beach Haus and did not limit Beach Haus' complete control over the Property."[111] Further, this allegation pertains to the Property that BHQ sold to Beach Haus; it is not in any way probative of BHQ's alleged intent to hinder or delay creditors by making the alleged transfers here to Amerant

Finally, the Trustee's allegation that BHQ transferred substantially all of its assets to Beach Haus does not plausibly support a fraudulent transfer claim against Amerant. To the contrary, it supports a plausible explanation why Amerant received the alleged transfers: because BHQ was disposing of its assets that secured Amerant's claims, BHQ necessarily had to pay its secured creditor (or get its consent) to transfer its assets to Beach Haus.

With respect to the Secured Claim Paydown, nothing plausibly alleges it was made for any reason other than that BHQ owed Amerant this money.[112] "It is not fraudulent to pay some but not all creditors, 'even though the effect might be to injure or prejudice an existing creditor who was not chosen to receive the debtor's

---

[111] Compl. ¶ 71.

[112] *See Sunshine Res., Inc. v. Simpson*, 763 So. 2d 1078, 1081 (Fla. 4th DCA 1999) (a payment made on a pre-existing mortgage is not a fraudulent transfer, even if the effect of the payment is to prefer one creditor over another).

largesse.'"[113] Moreover, to recover a payment made on a pre-existing mortgage as a fraudulent transfer, the plaintiff must establish that the pre-existing mortgage or other lien was not effective to secure the debt.[114] There have been no such plausible allegations here. Nor have there been any plausible allegations that Amerant was not entitled to the Legal Fee Reimbursement under its loan documents (which would be customary and commercially reasonable for Amerant to be entitled to such payment).

At bottom, none of the allegations plausibly allege that Amerant was paid for any reason other than that BHQ was obligated to do so. Nor do the allegations plausibly allege that Beach Haus's assumption of BHQ's debt – or even BHQ's satisfaction of Hemphill's claims – were done with the intent to hinder or delay BHQ's other creditors. Accordingly, the Trustee has failed to state a claim upon which relief may be granted with respect to both Counts I and II of his Amended Complaint.[115]

B.    Aiding and Abetting Breach of Fiduciary Duty.

Count III alleges Amerant aided and abetted Mr. Arcila and Mr. Mahecha's breaches of their fiduciary duties to BHQ. An aiding and abetting claim under Florida law requires a plaintiff to allege: (1) an underlying violation by a primary wrongdoer; (2) knowledge of the underlying violation by the alleged aider and abettor; and

---

[113] *Barbee v. Amerant Bank, N.A., (In re Luna Devs. Grp., LLC)*, 618 B.R. 595, 611 (Bankr. S.D. Fla. 2020) (quoting *Simpson*, 763 So. 2d at 1081 (quoting *Jacksonville Bulls Football Ltd. v. Blatt*, 535 So.2d 626, 629 (Fla. 3d DCA 1988))).

[114] *Wiand v. Wells Fargo Bank, N.A.*, 86 F. Supp. 3d 1316, 1326-27 (M.D. Fla. 2015).

[115] Because the Court has found that two of the four challenged transactions were not even transfers subject to avoidance, and as to the other two, the Trustee has not plausibly alleged those transfers were made with actual intent to hinder, delay or defraud creditors, the Court need not address Amerant's argument that there were no avoidable transfers because it held a fully secured claim, was not repaid more than it was owed, and BHQ's estate was not diminished by the payments to Amerant.

(3) rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor.[116] When an aiding and abetting breach of fiduciary duty claim is asserted against a lender, however, the plaintiff must allege specific facts showing that the lender knew that its customer was engaging in wrongful or illegal activity.[117] This "knowledge" element "will only be satisfied if the plaintiff pleads facts demonstrating that the bank had 'actual knowledge' of the wrongdoings."[118]

With respect to the first prong – an underlying violation – the Trustee must allege there was a breach of fiduciary duty. To state a claim for breach of fiduciary duty under Florida law, a plaintiff must plausibly allege: (1) the existence of a fiduciary duty, (2) breach of a fiduciary duty, and (3) that the breach proximately caused the plaintiff's damages.[119] Based on the facts pleaded in the Amended Complaint, the Trustee has plausibly alleged that Messrs. Arcila and Mahecha had a fiduciary duty to BHQ, as its managers and control persons. Although the Trustee's allegations that the Property could have been sold for enough to pay Amerant in full *and* provide some recovery for the Investors are somewhat lacking, the Court will presume that the Trustee plausibly pleaded breaches of fiduciary duty and proximately-caused damages, based at least on the allegations that BHQ had

---

[116] *Furr v. T.D. Bank, N.A. (In re Rollaguard Sec., LLC)*, 591 B.R. 895, 922 (Bankr. S.D. Fla. 2018) (quoting *Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 907 (11th Cir. 2012)).

[117] *Luna Devs.*, 618 B.R. at 613 n.156 (collecting cases).

[118] *Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 993 (11th Cir. 2014) (citing *Lawrence*, 455 F. App'x at 907).

[119] *Silver Crown Investments, LLC v. Team Real Estate Mgmt., LLC*, 349 F. Supp. 3d 1316, 1331 (S.D. Fla. 2018) (citing *Gracey v. Eaker*, 837 So.2d 348, 353 (Fla. 2002); *Doshi v. Cagle Road Land, LLC*, Case No. 3:17–cv–308–J–34JRK, 2018 WL 1796224, at *8 (M.D. Fla. Jan. 23, 2018)).

considered but decided not to file for bankruptcy earlier. Thus, to determine whether the Trustee adequately stated a claim for aiding and abetting breach of fiduciary duty, the Court will presume the Trustee adequately pleaded an underlying violation here – breach of fiduciary duty by Messrs. Arcila and Mahecha. But it is with respect to the other two elements of aiding and abetting breach of fiduciary duty – knowledge and substantial assistance – where the Trustee's claim meets its demise.

With respect to knowledge of breach of fiduciary duty, the Trustee has alleged that Amerant knew Messrs. Arcila and Mahecha had been accused of perpetrating a massive Ponzi scheme through Luna; that the Property was being sold to Beach Haus for less than its appraised value; that the sale to Beach Haus would net no cash proceeds for BHQ (other than through the Earn-Out); and that many Investors had sued BHQ. The Trustee also alleges that Amerant *actually knew* that if the Property had been sold for more money, other creditors could have been paid, and that Amerant knew BHQ had other available options to achieve fair market value for the Property – like filing for bankruptcy – but failed to do so. But these allegations do not plausibly support the element of actual knowledge of breach of fiduciary duty. It was impossible for Amerant – or anyone else – to have actually known that if the Property had been sold for more money, other creditors could have been paid. Indeed, Beach Haus assumed over $9 million of secured debt in connection with the sale of the Property.[120] It is one thing to allege that if Messrs. Arcila and Mahecha did not breach

---

[120] Thus, BHQ would have had to sell the Property for well more than $9 million over the Beach Haus sale price, in order to pay Amerant in full and then have additional proceeds available for other creditors.

their fiduciary duty and either properly marketed the Property or caused BHQ to file for bankruptcy earlier, then the Property could have been sold for more money. But it is quite another thing to allege that Amerant knew – *actually knew* – that if the Property had been sold for more money, other creditors could have been paid.[121] This is mere conjecture by the Trustee, and there are no plausible allegations to support Amerant's actual knowledge of any breach of fiduciary duty by Messrs. Arcila and Mahecha.

The Trustee's allegations of substantial assistance fall even shorter than his knowledge allegations. "Substantial assistance occurs when a defendant affirmatively assists, helps conceal, or fails to act when required to do so, thereby enabling the breach to occur."[122] But "mere inaction" will constitute substantial assistance "only if the defendant owes a fiduciary duty directly to the plaintiff."[123] Moreover, "in the context of aiding and abetting claims against banks, Florida law does not require banks to investigate their customers' transactions."[124] Here, there are no plausible allegations that Amerant owed a fiduciary duty to BHQ or its creditors. Indeed, Amerant's fiduciary duty was to its own shareholders to minimize its losses on a distressed credit and extricate itself from the risk of continuing to be

---

[121] The Trustee's allegations regarding the appraised value of the Property, while perhaps probative of his fraudulent transfer claims against Beach Haus, do not support his allegations that Amerant knew Messrs. Arcila and Mahecha were breaching their fiduciary duties to BHQ.

[122] *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1098 (11th Cir. 2017).

[123] *Id.* (internal quotation marks and citation omitted).

[124] *Rollaguard*, 591 B.R. at 922-23 ("'Red flags' and mere suspicions are insufficient to trigger any obligation by [a bank] to investigate.") (internal citation omitted).

in a borrower-lender relationship with BHQ.[125] Thus, in extending credit to Beach Haus to fund its purchase of the Property (and therefore substitute a more creditworthy borrower for BHQ), Amerant did not substantially assist in Messrs. Arcila and Mahecha breaching their fiduciary duties.

Likewise, Amerant requiring BHQ to satisfy Hemphill's judgment against Luna – and thus extricate Amerant from Hemphill's fraudulent transfer suit – does not demonstrate substantial assistance in breach of fiduciary duty. It demonstrates that Amerant had had enough of this lender-borrower relationship, and wanted out. It also plausibly demonstrates – as would be customary with commercial loan documents – that BHQ and its principals had an obligation to Amerant to indemnify Amerant against claims of this type. That the claims asserted were fraudulent transfer claims relating to another entity controlled by Messrs. Arcila and Mahecha says nothing about the merits of those claims, though.

Similarly, Amerant's desire for a release – to stem off and extricate itself from further litigation that seemed to follow BHQ at every turn – and Amerant's request for additional security to protect itself from lingering litigation in the form of a collateral assignment with respect to the Earn Out, do not plausibly allege substantial assistance. They show Amerant sought to protect itself and maximize recovery on its collateral. Finally, Amerant's alleged failure to stop BHQ from making

---

[125] *See Sharp*, 403 F.3d at 52-53 (lender's discovery that its borrower "was rife with fraud was an asset" of the lender, who "had a fiduciary duty to use that asset to protect its own shareholders, if it legally could.")

alleged false representations to a title company does not constitute – or even support – a claim for aiding and abetting a breach of fiduciary duty.[126]

Clearly, Amerant had a distressed borrower. Perhaps worse than that, Amerant had an untrustworthy borrower. Even worse, Amerant had a borrower that may have been defrauding other creditors. That Amerant knew these facts and sought to extricate itself from its lending relationship with this borrower and maximize recovery on its loan – without more – does not demonstrate substantial assistance. It demonstrates only that Amerant acted appropriately and prudently as a lender seeking to maximize recovery on its loan or minimize its losses, and in accordance with its own legal and contractual rights.[127] Acts that are "consistent with normal, lawful [banking] business practices" – like those undertaken by Amerant here – will not support an aiding and abetting breach of fiduciary duty claim.[128]

Likewise, that the Bank Term Loan was in Amerant's special assets division, that Amerant may have made a Bank Secrecy Act report with respect to this loan or borrower, that Amerant was concerned about other litigation relating to this borrower (some involving Amerant, some not), and that Amerant therefore sought to extricate itself from this relationship and maximize its recovery (or minimize its loss) demonstrates only that Amerant was acting consistent with normal, lawful banking

---

[126] *In re NewStarcom Holdings, Inc.*, 547 B.R. 106, 132 (Bankr. D. Del. 2016), *aff'd,* 608 B.R. 614 (D. Del. 2019) ("The question here is whether a failure to act constitutes "aiding and abetting," and the Trustee has offered no precedent or authority for such a holding. "Aiding and abetting," by definition, implies active participation or affirmative action.").

[127] *See Sharp*, 403 F.3d at 51 (where lender requested repayment and encouraged borrower to obtain new financing, and lender had right to foreclose, lender did not aid or abet borrower in breaching fiduciary duty even though borrower was defrauding its own investors).

[128] *Luna Devs.*, 618 B.R. at 615 n.169 (quoting *Krys v. Pigott*, 749 F.3d 117, 132 (2d Cir. 2014)).

business practices. To suggest that a bank taking these prudent steps to address these legitimate concerns somehow renders a bank as having substantially assisted a breach of fiduciary duty would turn sound banking practice on its head, and discourage the very behavior that should be encouraged in responsible lending institutions. Count III therefore fails to state a claim upon which relief may be granted as well.

C.    Conspiracy to Commit Breach of Fiduciary Duty.

In Count IV, the Trustee alleges that Amerant conspired with Messrs. Arcila and Mahecha to breach their fiduciary duties. To plausibly allege a civil conspiracy, the Trustee must allege: (a) conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to the plaintiff as a result of the acts done under the conspiracy.[129] An actionable conspiracy requires a plaintiff "provide some factual basis for the legal conclusion that a conspiracy existed."[130] But "[t]he existence of a conspiracy and an individual's participation in it may be inferred from circumstantial evidence."[131]

The Trustee argues that a conspirator need not take part in the planning, inception, or successful conclusion of a conspiracy; "the conspirator need only know

---

[129] *Camden Shipping Corp. v. Manson Constr. Co.*, No. 3:07-CV-560-J-25 JRK, 2008 WL 11433231, at *4 (M.D. Fla. Mar. 19, 2008); *Fla. Fern Growers Ass'n, Inc. v. Concerned Citizens of Putnam Cty.*, 616 So.2d 562, 565 (Fla. 5th DCA 1993).

[130] *Rindley v. Gallagher*, 890 F. Supp. 1540, 1557 (S.D. Dist. Fla. 1995).

[131] *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1160 (Fla. 3d DCA 2008).

of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators."[132] The Trustee then argues that the "unlawful act" that Amerant knew of was Messrs. Arcila and Mahecha's alleged breaches of their fiduciary duties to BHQ,[133] and that "just like with his claim for aiding-and-abetting,"[134] Amerant allegedly had knowledge of this underlying tort. But, for the reasons discussed above, there are no plausible allegations that Amerant knew BHQ's managers were breaching their fiduciary duties. Even assuming Amerant did know BHQ's managers were breaching their fiduciary duties, however, there certainly are no plausible allegations that Amerant entered into any conspiratorial agreement with BHQ to help them do so.

As pointed out by Amerant, the Trustee's allegations fail the plausibility test on their face.[135] Why would Amerant possibly enter into a "corrupt agreement" with Messrs. Arcila and Mahecha to sell the Property for $20 million less than its fair market value? The facts alleged support the "obvious alternative explanation"[136] that Amerant wished to extricate itself from a bad loan, a bad borrower, and bad principals. There are simply no plausible allegations of any corrupt agreement between Amerant and Messrs. Arcila and Mahecha. Indeed, the only plausible allegations of any relevant agreements were of the loan agreements between BHQ

---

[132] *Id.* at 1160.

[133] Resp. 18.

[134] *Id.*

[135] Reply 17.

[136] *Iqbal*, 556 U.S. at 682; *Twombly*, 550 U.S. at 567.

and Amerant in respect of the Bank Loans, pursuant to which it would have been customary and commercially reasonable to require BHQ to pay Amerant those amounts the Trustee challenges here. Count IV therefore fails to state a claim upon which relief may be granted and will also be dismissed.[137]

## V.    Dismissal With Prejudice.

This Court's briefing order with respect to the Motion to Dismiss[138] clearly required the Trustee to file – *together with his response to the Motion to Dismiss* – a motion for leave to amend under Federal Rule of Civil Procedure 15(a)[139] along with a proposed amended complaint and a redlined comparison indicating the changes, if the Trustee wanted to request leave to amend his Amended Complaint. The Briefing Order further stated that "**failure to file a motion for leave to amend along with any response to the Motion [to Dismiss] constitutes a waiver of the right to request leave to amend and, if the Motion [to Dismiss] is granted, may result in dismissal of the action with prejudice**."[140]

Rather than comply with the Briefing Order and Rule 15(a), the Trustee instead included in his Response a "Request to Replead," in which he acknowledged the Briefing Order, but claims he chose to file his Response to address what he

---

[137] Because the Court has determined that each Count of the Amended Complaint fails to state a claim upon which relief may be granted, the Court need not address Amerant's argument that the Trustee has not alleged a legally sufficient basis to recover attorneys' fees and costs.

[138] *Order Continuing Pretrial Conference and Setting Briefing Schedule on Motion to Dismiss* (ECF No. 10) (the "Briefing Order").

[139] Made applicable here by Fed. R. Bankr. P. 7015.

[140] Briefing Order 2-3 (emphasis in original).

contends are Amerant's "mischaracterizations" and "misguided arguments." The Trustee then requests the opportunity to replead if the Court determines his Amended Complaint is lacking, and argues that he "can plead additional factual detail . . . but has endeavored to plead a 'short and plain statement' of the claim showing he is entitled to relief."[141]

To the extent the Trustee is somehow arguing that Federal Rule of Civil Procedure 8(a)(2)[142] sets a lower bar than what the Supreme Court has required in construing this very rule in *Twombly*[143] and *Iqbal,*[144] that is of course incorrect. Under *Twombly* and *Iqbal*, to satisfy the requirement of Rule 8(a)(2) that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief,"[145] the claim must be plausible on its face.[146] The Amended Complaint here fails to satisfy that requirement for the reasons discussed in detail above. If the Trustee had more factual support for his claims (his Amended Complaint contained 155 paragraphs spanning 37 pages), he should have included them in the first instance.[147]

---

[141] Resp. 19-20 (citing Fed. R. Civ. P. 8(a)(2)).

[142] Made applicable here by Federal Rule of Bankruptcy Procedure 7008.

[143] 550 U.S. 544.

[144] 556 U.S. 662.

[145] Fed. R. Civ P. 8(a)(2).

[146] *Iqbal*, 556 U.S.at 678 (quoting *Twombly*, 550 U.S. at 570).

[147] Indeed, the Trustee's suggestion that he had more factual support, but was holding it back to include in a later amendment, evinces the type of gamesmanship and improper litigation tactics the Court sought to deter by specifically requiring the Trustee to file a motion for leave to amend (together with a proposed amended complaint and redline) along with his Response. Litigation is supposed to be "just, speedy and inexpensive." Fed. R. Bankr. P. 1001. The lack of merit to the claims as pleaded –

The Eleventh Circuit has held that a court "is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court."[148] Here, the Court specifically advised the Trustee in the Briefing Order that if he wished to request leave to amend, he must file a motion for leave to amend with his Response. He did not do so, and the Court need not construe a request to amend in a brief as a timely motion for leave to amend under Rule 15(a).[149]

The Trustee was given ample notice of Amerant's grounds for dismissal and was provided with an opportunity to seek leave to amend to cure any deficiencies. Instead, the Trustee chose to stand on his legally deficient Amended Complaint. By doing so, the Trustee has maintained that his Amended Complaint was sufficient as pleaded. Now that the Court has determined the Amended Complaint failed to state a claim upon which relief may be granted as a matter of law – and the Trustee has failed to timely and properly propose any further amended complaint – the Trustee

---

along with his failure to comply with the Briefing Order – can only lead the Court to conclude that the Trustee's strategy was designed to maximize Amerant's defense costs.

[148] *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) (en banc) (overruling precedent requiring that a plaintiff be given at least one chance to amend his complaint before the court dismisses the action with prejudice).

[149] *Perlman v. Bank of Am., N.A.*, 561 F. App'x 810, 814 (11th Cir. 2014) (affirming district court's denial of leave to amend where the plaintiff sought leave to amend in a footnote contained in his response to a motion to dismiss, which did not indicate what additional facts the plaintiff intended to allege in a proposed amended complaint); *see also Isaiah v. JPMorgan Chase Bank*, 960 F.3d 1296, 1308 n.9 (11th Cir. June 1, 2020) (rejecting appellant's request to amend complaint to assert additional facts to avoid dismissal, raised for the first time in supplemental briefing on appeal, where plaintiff "maintained throughout that his complaint is sufficient as it presently stands.").

will not be given another opportunity to amend his Amended Complaint. The Amended Complaint will therefore be dismissed with prejudice.

## VI.    Conclusion.

The facts alleged here do "not permit the court to infer more than the mere possibility"[150] of liability against Amerant. Rather, based on the facts alleged and accepted as true – along with the Court's "judicial experience and common sense"[151] – the only reasonable inference the Court can draw is that Amerant acted appropriately in extricating itself from a troubled credit, and that none of the actual transfers made to Amerant were made for any reason other than that BHQ was legally obligated to do so under the terms of the Bank Loans. These conclusions are "obvious alternative explanation[s]"[152] to the Trustee's allegations. Accordingly, not only do the Trustee's allegations fail to "nudge" his claims "across the line from conceivable to plausible,"[153] they do not come anywhere close to this line, and must therefore be dismissed. And because the Trustee did not properly and timely request leave to further amend his Amended Complaint, dismissal will be with prejudice.

## <u>ORDER</u>

For the foregoing reasons, it is therefore **ORDERED** that:

1.    The Motion to Dismiss is **GRANTED**.

2.    The Amended Complaint is **DISMISSED WITH PREJUDICE**.

---

[150] *Iqbal*, 556 U.S. at 679.

[151] *Id.*

[152] *Id.* at 682; *Twombly*, 550 U.S. at 567.

[153] *Twombly*, 550 U.S. at 570.

# # #

Copies to all parties of record by the Clerk of Court.